**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| MIDLAND NATIONAL LIFE<br>INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | No.  08-1367-MLB |
| | ) | |
| QUANETT JOHNSON-MARIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM DECISION**</u>

<u>**Introduction**</u>

This case began as and remains an interpleader action.  However, it  has proven to be more complex than the usual interpleader brought by  an  insurance  company  which  simply  seeks  to  be  relieved  from liability to parties having disputed claims to, in this case, annuity payments.

Midland  National  Life  Insurance  Company  (Midland),  an  Iowa corporation, issued three annuities to Quanett Johnson-Marin (Johnson-Marin) nominally as "owner."  Johnson-Marin, a Kansas resident who is in default (Doc. 21), sold the annuities to the Henderson defendants (Henderson) which are located in Nevada and Delaware, in return for a lump-sum cash payment.  Rito Duque Ramirez (Ramirez) likewise is a resident of Kansas.  Both Henderson and Ramirez claim entitlement to the annuity payments.  Johnson-Marin, for reasons which will become apparent,  makes  no  claim  to  the  annuities.  Thus  there  is  complete diversity between the claimants.  Midland has deposited $114,205.08 with  the  clerk  of  this  court.  Accordingly,  the  court  has  subject

matter jurisdiction, <u>see</u> 28 U.S.C. § 1335(a); <u>General Atomic Co. v. Duke Power Co.</u>, 553 F.2d 53, 56 (10th Cir. 1977), and the parties do not contend otherwise.

## Procedural Background

Midland filed this case in November 2008.  By March 2009, all defendants had been served and the magistrate judge set a discovery deadline of July 2009 (Doc. 20).  Thereafter all parties (except Johnson-Marin) announced a settlement but in November 2009, this court declined to approve the settlement.

In April 2010, Midland filed an amended complaint (Doc. 47) and soon thereafter, Ramirez, Midland and Henderson each filed cross-motions for summary judgment (Docs. 52, 54 and 55).  The motions were denied in October 2010 (Doc. 63) and reconsideration was denied in December 2010 (Doc. 68).  The pretrial order was filed in February 2011 (Doc. 71).  A bench trial was conducted on August 2 and 31, 2011 and the parties' final submissions were submitted by October 2011 (Docs. 91-93).  Here follow the court's findings and conclusions pursuant to Fed. R. Civ. P. 52.

## Facts

1.   Jose Santos Hernandez Martinez died as a result of a workplace injury.  Martinez's surviving spouse, Rosa Delama Ramirez De Hernandez (Ms. Martinez)[1], and her three minor children brought a wrongful death worker's compensation claim in North Carolina against Martinez's employer, BB&K Construction, Inc. ("BB&K"), and its insurance carrier.  The parties settled the claim and BB&K and its

---

[1] The parties also refer to Ms. Martinez as Rosa Del Lima Ramirez Rodriguez.

insurance carrier agreed to pay a single payment in the amount of $146,460. The payment was made to The Jernigan Law Firm, counsel for Ms. Martinez. After deduction of attorneys fees and costs, $118,491 was paid to The Jernigan Law Firm "in trust" for Ms. Martinez and the children (Exh. 483). However, there is nothing in the record showing that a "trust" was created.

2. The settlement agreement provided for The Jernigan Law Firm to pay out the $118,491 as follows:

A. $17,784 to Ms. Martinez in care of her local counsel in Texas;

B. $25,563 to The James Street Group for the purchase of an annuity for the benefit of the minor child Rose Angelica Hernandez, sub-annuity to make equal monthly payments to Ms. Martinez as the parent and natural guardian of Rosa Angelica Hernandez, with the final payment on the annuity being on the 18th birthday of the minor child;

C. $36,467 to The James Street Group for the purchase of an annuity for the benefit of the minor child Adulfo Hernandez Ramirez, sub-annuity to make equal monthly payments to Ms. Martinez as the parent and natural guardian of Adulfo Hernandez Ramirez, with the final payment on the annuity being on the 18th birthday of the minor child;

D. $38,677 to The James Street Group for the purchase of an annuity for the benefit of the minor child Yerick Hernandez Ramirez, sub-annuity to make equal monthly payments to Ms. Martinez as the parent and natural guardian of Yerick Hernandez Ramirez, with the final payment on the annuity being on the 18th

-3-

birthday of the minor child.

3. On January 11, 2006, Johnson-Marin was named power of attorney for Ms. Martinez and the children. The power of attorney was in Spanish. When translated into English, it authorized Johnson-Marin to "take all legal steps and formalities related to the death . . ." of Martinez. (Exhs. 505 and 506).

4. On January 23, 2006, the worker's compensation settlement was approved by the North Carolina Industrial Commission (Exh. 484).

5. On June 29, 2006, the North Carolina Industrial Commission amended its order to allow the annuities to be purchased through Millennium Settlements, a structured settlement firm located in California (Exh. 485). Payments were to be directed to the account of Johnson-Marin, as attorney-in-fact for Ms. Martinez, at Bank of America.

6. Bryan Milner, also known as Douglas Milner, is an agent with Millennium Settlements. According to testimony of Diana Ronald, second vice-president of Midland, Milner provided Midland with three fixed annuity applications, each dated May 15, 2006, which designated Johnson-Marin as "owner" and "annuitant's beneficiary" and the three minor children as "annuitant." (Exhs. 486, 492 and 498). The designations were selected by Milner and Johnson-Marin. Midland relied exclusively on the language of the applications as to Johnson-Marin's status (Ronald Tr. Doc. 97 at 55-56, 60-61). Midland had no authority to change the designations. (Id. at 16-17). Although Midland was aware that Johnson-Marin had a power of attorney and that minor children were involved, Midland made no inquiry regarding Johnson-Marin's authority to designate herself as owner, even though

Johnson-Marin did not purchase the annuities. (<u>Id.</u> at 46-48). The "owner's beneficiary" designation on each application initially was not completed. However, later in 2006, Johnson-Marin amended each application to designate the children as the "owner's primary beneficiary." (Exhs. 490, 496 and 502).

7. The Midland annuity contracts were funded by separate checks drawn on the Jernigan Law Firm. Each check was dated June 29, 2006 and was payable to Midland National Life in the amounts specified in paragraph 2 B, C and D, <u>supra</u>. (Exhs. 512, 517 and 520). The "memo" portion of each check listed the respective minor child's name.

8. Each annuity contains the following:

Section 1: DEFINITIONS

Annuitant:     The person(s) named in the application and on the Specifications Page to whom periodic income will be paid. This is the person whose life is used to determine the amount and duration of any periodic income involving life contingencies. The Annuitant will be considered the Owner of the contract unless otherwise stated on the application.

* * *

Owner:  The person(s) or entity named in the application or the latest change filed with Us who is entitled to exercise all rights and privileges provided in the contract.

* * *

SECTION 4: ANNUITANT, OWNER, AND BENEFICIARY PROVISIONS

Ownership: This contract belongs to You.  You have all rights granted by this contract, including the right to change Owners and Beneficiaries, subject to the rights of:

a) Any assignee or record with Us;
b) Any irrevocable beneficiary; and
c) Any restricted ownership.

We must receive Written Notice informing Us of any change, designation, or revocation. Once recorded, a change, designation or revocation takes effect as of the date the Written Notice was signed.  However, We are not liable for payments made by Us

-5-

before We record the Written Notice.

(Exhs. 401, 429 and 456).

9.   In letters dated July 12, 2006, Milner provided Midland with the Spanish language version of the power of attorney the status of the annuitants as minors and residents of Mexico and information regarding electronic transfer of the annuity payments to Marin-Johnson's account at Bank of America (Exhs. 507-511).

10.   Milner was persistent in checking the status of the annuity applications and often experienced delay.  From July 13 through August 24, 2006, Milner made 10 phone calls checking on the status of the annuity applications.[2]  During these calls, Milner repeatedly stated that Johnson-Marin was the power of attorney for the annuitant children in Mexico.

11. Milner was not licensed in Kansas at the time the annuity applications were initially signed and Midland needed a new page after Milner received his Kansas license.  The new "sign date" was July 21, 2006.

12.  On July 28, 2006, Milner was informed that Midland was in the process of reviewing the Spanish language power of attorney.  The Midland representative indicated that she hoped there was someone "here" who could interpret the power of attorney.  (Plaintiffs' Exh. 2).  There is nothing in Midland's files to indicate that Midland ever translated the power of attorney into English (Ronald Tr. Doc. 97 at 38, 45).

13.   On July 31, 2006, Milner was informed that Midland's

---

[2] These phone calls are recorded on Plaintiff's stipulated exh. 2.

assistant manager and supervisor were reviewing the applications because the three children lived in Mexico.

14. On August 3, 2006, Milner was informed by Midland that he needed to submit additional forms before Midland could issue the annuities, one of which was necessary because the children lived in Mexico.

15. On August 23, 2006, Milner was told that Midland could not issue the annuities with the payment schedule that Midland's marketing department had initially quoted. Nevertheless, the specifications page of each annuity lists the "issue date" as July 21, 2006.

16. After Midland issued the annuities, the payments were sent to Johnson-Marin's Bank of America account. On February 16, 2007, Johnson-Marin called Midland regarding an error on her 1099-R form. During this phone call, Johnson-Marin explained to Midland that she was holding the annuities for the children.

17. On November 16, 2007, Ms. Martinez signed a second Spanish language power of attorney, this time appointing Rito Duque Ramirez to handle all business matters related to the annuities. Ramirez is said to be the Martinez children's great uncle who had been in a previous "relationship" with Johnson-Marin. The translated document states, inter alia, that Ms. Martinez does not want Johnson-Marin to have anything to do with "the matter" and that Johnson-Marin had not remitted to her the annuity payments made by Midland on the three annuities for the previous four months (Exh. 523). There is nothing in the record to indicate that the second power of attorney, either in original Spanish or in English, was sent to Midland in November 2007.

18.  For the tax year 2006, Midland issued three forms 1099-R reflecting distributions to Johnson-Marin totalling $4,815.35 (Exhs. 491, 497 and 503).  For tax year 2007, similar forms reported distributions totalling $11,508.84 (Exhs. 488, 494 and 500).  All together, Midland made payments to Johnson-Marin from September 2006 to January 2008 (Ronald Tr. Doc. 97 at 20).

19.  The record is silent with respect to Johnson-Marin's use of the distributions.  She appeared pursuant to subpoena at the August 31, 2011 hearing but declined to testify on the basis of the Fifth Amendment.

20.   Sometime around January 2008, Johnson-Marin contacted Henderson regarding the annuities.  According to Lauren Capriotti, Henderson's assistant general counsel, the initial contact would have been by phone or through Henderson's website.  A sales representative contacted Johnson-Marin who told her to ". . . send in whatever documentation . . ." she had.  The documentation was then reviewed so that Henderson could ". . . decide if they had what we think is a valid annuity that they could sell."

21.  The documentation consisted of "specification pages" and the evidence on this point is discrepant.  The specification pages attached to the Henderson Purchase Agreements show Johnson-Marin as the "owner" of each annuity.  There is no designation of "annuitant." (Exhs. 402, 430 and 457).  However, the specification pages for each annuity as issued by Midland show Johnson-Marin as "owner" and, respectively, each child as "annuitant."  (Exhs. 401, 429 and 456). According to Ronald, the specification pages attached to the Henderson Purchase Agreements are not Midland documents.  (Ronald Tr. Doc. 97

-8-

at 29, 30).   There is nothing in the record to definitively resolve the discrepancy.   The person or persons who reviewed the documentation are no longer employed by Henderson.  (Capriotti Tr. Doc. 90 at 6-8).

22.   Henderson's files contain numerous additional documents relating to the sale of the annuities by Johnson-Marin to Henderson but the Midland annuities themselves are not among them.   Capriotti identified letters dated January 11, 2008 signed and sworn to by Johnson-Marin on January 16, 2008 authorizing Midland to send copies of the annuities to Henderson (Exhs. 412, 440 and 467).   The parties have stipulated that Midland's files reflect receipt of these letters on January 23, 2008. Henderson may have made phone requests for the annuities as well, but there are no records of the requests in its files.   Midland's phone records do not contain telephonic requests from Henderson for the annuities.   This is another unresolved discrepancy but even if Henderson had made the telephonic requests, Midland would not have honored them because it considered Johnson-Marin to be the owner of the annuities.  (Ronald Tr. Doc. 97 at 23, 39-45).

23.   By letters dated January 11, 2008 and signed by Johnson-Marin before a notary on January 16, 2008, Johnson-Marin notified Midland that Henderson is the ". . . new, Payee, Owner and as beneficiary of my . . ." annuities.  (Exhs. 410, 438 and 465). Another trio of letters dated January 11, 2008 addressed to Midland and signed by Johnson-Marin before a notary on January 16, 2008 represented, as follows: "I certify that I am the payee under the annuity contract and have sole authority over rights to payments there under [sic].   I certify that I am the only individual entitled to

benefits under the Annuity Contract." (Exhs. 413, 441 and 468). There followed letters dated January 22, 2008 from Henderson to Midland attaching forms ". . . necessary to make an absolute assignment of payments, a change of beneficiary and a change of payee . . ." on each annuity (Exhs. 421, 449 and 476). The letters were stamped "received" by Midland on January 23, 2008.

24. Even after Midland received the transfer documents signed by Johnson-Marin, it did not send the annuities to Henderson. Capriotti testified that Henderson did not receive the annuities it requested and, in fact, did not see the annuities until two days before the August 2, 2011 hearing (Capriotti Tr. Doc. 90 at 16-17). Capriotti admitted that it was common for Henderson to make purchases without first obtaining copies of the annuities (id. at 43).

25. Similarly, the worker's compensation settlement documents and the power of attorney to Johnson-Marin are not contained in Henderson's files (id. at 20 and 27). Capriotti testified that Johnson-Marin, representing herself as the "owner and payee" of the annuities, gave Henderson written consent ". . . to the release of 'legal or financial records' requested by [Henderson] and to Henderson's verification of information in the submitted documents as well as personal consumer information." (Exhs. 414, 443 and 470). There is nothing in the record to indicate that Henderson used this consent prior to purchasing the annuities.

26. The "Purchase Agreements" for each annuity were signed by Johnson-Marin, by her husband and by a representative of Henderson on January 16, 2008 (Exs. 402, 430 and 457). The Agreements provide, in pertinent part:

## PURCHASE AGREEMENT

This is a Purchase Agreement.  The date of this Agreement is ___Jan. 16_____, 200_8_.  Quanett Johnson and [3] is the Seller.  321 Henderson Receivables Origination LLC, a Nevada Limited Liability Company, its successors and/or assigns is the Buyer.  In this Agreement, Quanett Johnson is the Annuitant and [3] is the Owner, collectively they will be referred to as "You" or "Your" and 321 Henderson Receivables Origination LLC or its nominee, is referred to as "We", "Us" or "Our".

## BACKGROUND OF THIS AGREEMENT

1. On _____, You purchased an annuity contract ("Annuity") from Midland National Life Insurance Company (the "Annuity Company").  Under the terms of the Annuity, You are entitled to receive certain payments (the "Payments").

2. You desire to sell, assign and transfer to Us *all of Your rights to all Payments* under *the Annuity, as described on Exhibit "A"*, all of the other rights You have under the Annuity and the other rights as described in Section 1(a) below.  We desire to purchase all of Your rights and benefits, on the terms and under the conditions described in this Agreement.

3. The list of the Payments being sold under this Agreement is attached to this Agreement as Exhibit "A".  *You have supplied us with a copy of the Annuity.*

You and We agree as follows:

**1.**   **Purchase and Sale**

   a.   You now sell, transfer and assign to Us all *of the Your respective rights in the Assigned Assets*.  As used in this Agreement, the term "Assigned Assets" means (1) *the Annuity Policy*, (2) *Your rights to all Payments under the Annuity*, (3) *the Payments listed in Exhibit "A"*, (4) all of Your present or future rights to sell assign, transfer, cause an early termination of, modify, waive, settle, or receive value for, the Payments on Exhibit "A" and (5) all of Your other rights, if any, under the Annuity. By Our signing this Agreement, We are hereby purchasing and accepting the

_____

[3]These blank spaces appear in the Agreements.

sale, assignment and transfer of all of the Assigned Assets described above.

b.    The Gross Purchase Price purchase price is Twenty Thousand Dollars And No Cents ($20,000.00).   The Net Purchase Price payable to You is $20,000.00 (The "Purchase Price") (the "Purchase Price")..   The Purchase Price will be paid to You when both You and We sign this Agreement and You have delivered to Us all of the documents You are required to deliver pursuant to the terms of this Agreement, *We have obtained the written acknowledgment of the Annuity Company of the proposed sale and such Annuity Company has acknowledged on its books and records that We, or our assignee, is the owner, beneficiary and payee of the Annuity and the Assigned Assets, and We have otherwise completed Our internal process.*   You agree that the Purchase Price received by You will be allocated between the Owner and Annuitant as Owner and Annuitant may separately agree.

(Exh. 402 at 1-2)(emphasis supplied).

27.   As part of the purchase transaction for each annuity, Johnson-Marin signed disclosure statements confirming, <u>inter alia</u>, that the effective date of each agreement was the date it was signed (Exhs. 406, 434 and 461).   She also signed Special Irrevocable Powers of Attorney dated January 16, 2008 stating and acknowledging that she had sold, transferred, and granted a security interest in and conveyed the annuities to Henderson and irrevocably appointing Henderson to act for her behalf with respect to the annuities (Exs. 407, 435 and 462).

28.   In consideration of her sale and transfer of the three annuities, Henderson paid Johnson-Marin $49,000 or approximately 42% of the aggregate amount of the purchased annuity payments.

29.   The minor children were not identified by name or in any other manner in the documentation provided by Johnson-Marin to Henderson.   However, a trio of letters dated February 5 and 6, 2008

from Midland to Henderson directed to the attention of Jamie Muse identified Johnson-Marin as the "owner" of the annuities and named each child as the "annuitant." The letters did not specify that the annuitants were minors. Each letter stated, <u>inter</u> <u>alia</u>: "We [Midland] have approved the absolute assignment to R.C. Henderson trust FBO [name of annuitant] . . . . Please note this assignment will be irrevocable." (Exs. 422, 450 and 477). The letter represented by Exhibit 422 was resent to Henderson by email dated February 12, 2008 (Exh. 423) Each document bears the handwritten note: "Absolute assignment, irrevocable" with initials which are not identifiable. According to Ronald, Midland had no power to stop the assignment of the annuities to Henderson because Johnson-Marin was the "owner of the contracts." (Ronald Tr. Doc. 97 at 27, 28). The letters alerted Henderson to the annuities being for the benefit of third parties, but Henderson did not follow up. (Capriotti Tr. Doc. 90 at 60-61).

30. Midland prepared and presumably sent to Henderson two checks dated February 14, 2008 which noted "FBO" followed by the names of two of the annuitants (Exs. 518 and 521).

31. By letter dated February 28, 2008 and received by Midland on February 29, 2008, counsel for Ms. Martinez notified Midland that the power of attorney previously given to Johnson-Marin was "revoked and rescinded" and instructed that payments due on the annuities be remitted to Ramirez. Martinez's counsel did not notify or make a similar demand on Henderson (Exh. 504). Counsel sent a follow-up letter to Midland dated March 5, 2008 (Exs. 524 and 525). There is no evidence that Henderson received either letter.

32. By letter dated May 8, 2008, Henderson sent Midland ". . .

-13-

. forms necessary to make an assignment of payments, or change of beneficiary and change of payee" on Johnson-Marin's policy as well as a letter from Johnson-Marin (Exh. 515). The forms, signed by Johnson-Marin and her husband, Martin Marin Lopez, are dated May 8, 2008. Henderson is identified as the "new owner" on each form (Exh. 514).

### Summary of Parties' Positions

The following summary is taken from the pretrial order (Doc. 71) and the parties' trial and post-trial submissions (Docs. 87 and 91 [Midland]; Docs. 83 and 93 [Ramirez] and Docs. 82 and 92 [Henderson]).

### Midland

Midland's position is that it was not a fiduciary and had no obligation to advise anyone or investigate anything (Doc. 91 at 2). Midland also cites K.S.A. 58-658 for the proposition that it was entitled to rely on the first power of attorney and had no duty to investigate the authenticity of the power of attorney, the validity of Johnson-Marin's designation, her qualifications, the propriety of her appointment or whether she was acting pursuant to her instructions (id. at 6-7).

### Ramirez

Ramirez's position is that Johnson-Marin had a limited power of attorney which allowed her to purchase annuities for the benefit of children but did not allow her to sell the annuities to Henderson. He cites <u>Farmers Grain and Supply Co. v. The Atchison, Topeka & Santa Fe Railway Co.</u>, 121 Kan. 10, 11, 245 P. 738 (1926) and <u>Estate of Draper v. Bank of America, et al.</u>, 288 Kan. 510, 518-19, 205 P.3d 698 (2009) which observed, in the context of a constructive trust:

Where, as here, a person who holds property that is

-14-

subject to a beneficial interest transfers the property, an action may be brought against the third party for the return of the property. The Restatement explains:

"(1) Where a person holding property in which another has a beneficial interest transfers title to the property in violation of his duty to the other, the transferee holds the property subject to the interest of the other, unless he is a bona fide purchaser.

"(2) Where the owner of property transfers it in fraud of third persons, the transferee holds the property subject to their claims, unless he is a bona fide purchaser." Restatement of Restitution § 168.[4]

Finally, Ramirez argues that Henderson is a merchant-buyer which must meet a high standard of good faith, citing Hammer v. Thompson, 35 Kan. App. 2d 165, 129 P.3d 609, review denied 281 Kan. 1377 (2006). Ramirez identifies a number of things Henderson failed to do before it purchased the annuities which he variously asserts demonstrate "failure to act with honesty in fact," failure to "meet any reasonable commercial standards of fair dealing in the trade," and failure to investigate, among other things (PTO, Doc. 71).

<u>Henderson</u>

Henderson's position is that Johnson-Marin had both actual and apparent authority under a general power of attorney as defined in K.S.A. 58-654 to sell the annuities, that it is a good-faith purchaser and thus is entitled to the annuities' proceeds. Henderson also asserts that Midland failed to properly set up the annuities (Docs. 82 at 9-10 and 92 at 7-9).

The bottom line of Henderson's position is that Johnson-Marin represented herself on documents provided by Henderson as the "owner" and "annuitant" of the annuities who had the absolute right to sell

--------

[4]Now Restatement Third, Restitution and Unjust Enrichment, § 58(2).

-15-

them and that Henderson relied in good faith on her representations.

### Analysis of the Parties' Positions

It should be immediately apparent that each parties' position is problematic, at least in part.  Midland cannot credibly contend that it "relied" on Johnson-Marin's power of attorney prior to issuing the annuities.  Although K.S.A. 58-658 exempts from liability third persons who act in reliance on a power of attorney, the statute still requires the "third person" to act in "good faith."  Midland evidently considers itself a "third person" under the statute.  Here, the evidence is uncontroverted that Midland never had the power of attorney translated into English and therefore had no way to know that the document <u>was</u>, in fact, a power of attorney, much less what it authorized Johnson-Marin to do, or not do.  Nor can Midland claim reliance on Milner, who apparently was relying on Midland to have the document translated.  The court is not impressed with Midland's glib footnote that when the power of attorney finally was translated, long after the fact, it granted Johnson-Marin the "power to conduct these transactions" (<u>id.</u> at 4, n.2), whatever Midland considers "these transactions" to be at this point.

The belatedly translated power of attorney gave Johnson-Marin authority to ". . . take all legal steps and formalities related to the death . . ." of Martinez.  Assuming this gave Johnson-Marin authority to purchase the annuities, Midland knew well before the issue date of July 21, 2006 that the annuities were for the benefit of the children.  Under no stretch of construction did the power of attorney authorize Johnson-Marin to use the annuity payments herself, much less sell the annuities and pocket the money.  Yet, by making

-16-

Johnson-Marin the "owner," that is exactly what Midland did, at least as far as Henderson is concerned.

Nor is the court persuaded by Midland's apparent "fall-back" argument, based solely on Ronald's testimony, that Midland was obligated to issue the annuities exactly in accordance with the applications submitted by Milner. The weight and credibility of this evidence is diminished by Midland's failure to translate the power of attorney, by Midland's knowledge of the purpose of the annuities and by Midland's failure to provide the original annuities to Henderson as authorized by Johnson-Marin. It seems reasonable to infer that Henderson's decision to purchase the annuities would have been much different had it been aware that the children, not Johnson-Marin, were the named annuitants. Overall, the court finds Ronald's explanations too "convenient" to be entirely credible.

The court also questions the applicability of Midland's cited case authority. Midland's cases speak to the first party relationship between insurance companies and their insureds in the context of claims by the insureds that their insurance companies failed to act in good faith in various ways. None of the cases, which involve homeowner and auto insurance policies, have facts remotely similar to this case. Furthermore, annuities are not considered life insurance policies, even when issued by an insurance company. In re Vinzant, 108 B.R. 752, 756 (Bankr. D. Kan. 1989).

Ramirez's reliance on Hammer v. Thompson is problematic because for the case to apply, even tangentially, Henderson must be a "merchant" under Article 2 of the UCC, K.S.A. 84-2-104(a). Ramirez cites no authority that an annuity contract is a "good"

-17-

as defined in § 84-2-105.  It may, or may not, be that Henderson "holds [itself] out as having knowledge or skill peculiar to the practices . . . involved in the transaction . . ." but there is no evidence in the record regarding what those practices are, what "reasonable commercial standards" Henderson failed to meet or anything else which establishes some baseline of industry practice.  In other words, applying <u>Hammer v. Thompson's</u> teachings, the record is inadequate to find either that Henderson is a "merchant" or what reasonable commercial standards of fair dealings apply to its business.[5]

Some of Henderson's positions are especially questionable.  At the outset, the court rejects Henderson's statement that Johnson-Marin was acting pursuant to a <u>general</u> power of attorney (Doc. 82 at 8). Clearly it was a limited power.  But the document's characterization is beside the point.  K.S.A. 58-656 requires every attorney-in-fact to carry out her fiduciary obligations in the best interests of the principal and to "avoid self-dealing and conflicts of interest."  No legitimate argument can be made that the power of attorney gave Johnson-Marin the authority to convert the annuity payments to her own use or sell the annuities to Henderson.  Presumably Johnson-Marin will be held criminally responsible for her actions.

The court also rejects Henderson's arguments about reliance on the provisions of the annuity contracts, i.e., that they could be assigned, that ownership could be changed, etc. (Doc. 92 at 9-10).

---

[5]In his post-trial submission, Ramirez claims that the annuity Purchase Agreements are based on fraud (Doc. 19 at 5-6).  No such claim is made in the Pretrial Order and Ramirez has not moved to amend the PTO.

The contracts did allow for this (see FOF ¶ 11, <u>supra</u>) but Henderson never saw the annuity contracts until long after this case was filed. Henderson cannot claim reliance on unseen provisions of the annuity contracts to justify its initial decision to purchase them any more than Midland can rely on the power of attorney given to Johnson-Marin which it did not have translated.   The court will address this more thoroughly in its discussion of Henderson's "good faith" argument, <u>infra</u>.

Finally, the court rejects as unsupported, and frankly bizarre, Henderson's argument that Ms. Hernandez and Ramirez are "without clean hands in protecting the interests" of the children and that Ms. Hernandez was "in agreement with the subterfuge created by Midland's issuance of the annuity contracts to Johnson-Marin as owner and beneficiary rather than referencing the three minor children as the beneficial owners of the annuity contracts that could trigger income tax ramifications" (Doc. 92 at 16-17).   The only evidence about Ms. Martinez and the children is that they are not U.S. citizens who reside in Mexico.   There is absolutely no evidence of any "subterfuge" involving Ms. Martinez and Midland.   Neither Ramirez nor Henderson make affirmative claims against Midland so, with the exception of the attorney's fees issue, <u>infra</u>, there is no point in further review of Midland's actions.

After carefully considering the parties' positions, the court believes the case turns on the issue as framed by Henderson itself: whether Henderson was a bona fide purchaser for value; in other words, that it was an innocent purchaser acting in good faith (Doc. 92 at 4).

### <u>Discussion of Henderson's Good Faith</u>

It has long been the law that bona fide purchase is an affirmative defense.  <u>Independent Coal & Coke Co. v. United States</u>, 274 U.S. 640, 650 (1927); <u>United States v. Bennett</u>, 296 F. 409, 413 (8th Cir. 1923) (appeal from the District of Kansas before the establishment of the 10th Circuit).  Albeit under a different set of facts, the Kansas Court of Appeals has observed that ". . . at least some modicum of investigation was required of a bonafide purchaser under these circumstances." <u>Larson Operating Co. v. Petroleum, Inc.</u>, 32 Kan. App. 2d 460, 469, 84 P.3d 626 (2004).

Henderson's good faith argument is premised upon Johnson-Marin's representations that she was the owner, annuitant and payee of the annuities.  These representations were made on documents generated by Henderson and given by Henderson to Johnson-Marin for signature.  Johnson-Marin  signed the documents, of course; if she hadn't, she wouldn't have been paid.  The only documents apparently provided by Johnson-Marin herself were the specification pages which did not reflect the children as annuitants.

Henderson says it was "duped" (Doc. 92 at 14) but the court is not persuaded because the evidence shows that Henderson did not follow its representations in its own Purchase Agreements.  As noted in paragraph 26, <u>supra</u>, each Agreement states: "You [Johnson-Marin] have supplied us [Henderson] with a copy of the Annuity."  Similarly, the Agreements represent: "We [Henderson] have obtained the written acknowledgment of the Annuity Company [Midland] of the proposed sale and such Annuity Company has acknowledged on its books and records that We . . . is the owner . .. of the Annuity . . ."  Neither of these events had occurred as of the date the Purchase Agreements were

signed, January 16, 2008.

The language of the Purchase Agreements, along with Henderson's requirement that Johnson-Marin sign authorizations allowing it to obtain the annuities themselves, clearly demonstrates Henderson's recognition that it needed independent validation of Johnson-Marin's right to sell the annuities. Henderson's completely unexplained failure to follow through on its own requirements is significant to its "good faith" argument. Capriotti's testimony that Henderson commonly purchases annuities without first obtaining the documents themselves, while not directly challenged, seems inconsistent, if not actually reckless, with the practice of a company which is in the business of purchasing annuities and structured settlements. But be that as it may, had Henderson followed through with its own requirements and using the authorization provided by Johnson-Marin, it would have learned that, contrary to her representations, Johnson-Marin was not the "annuitant" and "payee" of the annuities. Henderson would have discovered, based on the specification pages appended to the Midland annuities, that the children were the annuitants and therefore entitled to the periodic payments.

When Henderson did learn of the existence of the children as annuitants less than one month after the sale documents were signed, it did no follow up, as Capriotti acknowledged. Henderson has offered no explanation for these failures and no reasonable inference of its "good faith" purchase arises solely because Johnson-Marin signed documents prepared by Henderson. In short, Henderson really wasn't "duped" by Johnson-Marin; rather, it was the victim of a self-inflicted wound because it did not do the investigation and due

diligence established by its own requirements.

Accordingly, the court concludes, as a matter of law, that Henderson failed to prove that it is a good faith purchaser of the annuities.

### Attorney's Fees

Midland requests attorney's fees and cites <u>Transamerica Premier Ins. Co. v. Growney</u>, No. 94-3396, 1995 WL 675368 (10th Cir. Nov. 13, 1995) and <u>American Home Life Ins. Co. v. Barber</u>, No. 02-4168-SAC, 2003 WL 21289986 (D. Kan. May 16, 2003) in support. "[F]ees are normally awarded to an interpleader plaintiff who '(1) is 'disinterested' ( i.e., does not itself claim entitlement to any of the interpleader fund); (2) concedes its liability in full; (3) deposits the disputed fund in court; and (4) seeks discharge,' and 'who is [not] in some way culpable as regards the subject matter of the interpleader proceeding.'" <u>Growney</u>, 1995 WL 675368 at *1.

Both Ramirez and Henderson object to Midland's request for attorney fees claiming that it is culpable in the sale of the annuities from Johnson-Marin to Henderson. The court agrees, for the reasons already stated.

Accordingly, Midland's request for attorney's fees is denied. Ramirez cites no case law in support of his request for attorney's and it is also denied.

### Additional Briefing

In the usual interpleader, the court would declare that Ramirez is entitled to manage the annuities pursuant to the second power of attorney. But the court is not satisfied that such a declaration would be in the best interests of the children, the minor annuitants.

-22-

Rather than make a unilateral declaration on an issue not briefed by counsel, the parties are directed to confer and, if possible, agree on a solution which will ensure that the children will get full benefit of the remainder of the annuities.  If no solution can be reached, the court will consider such proposals as the parties may wish to offer.  The submissions must be filed on or before January 31, 2012.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed five pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this __9th__ day of January 2012, at Wichita, Kansas.

s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

-23-